**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MAURICE NELSON CLARK** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 23-4853** |
| | : | |
| **THE TRUSTEES OF THE** | : | |
| **UNIVERSITY OF PENNSYLVANIA** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                    **September 17, 2024**

A nurse manager in the Emergency Department at the Hospital of the University of Pennsylvania reported a nightshift nurse observed a pharmacist falling asleep during an overnight shift in May 2022. Pharmacy leadership disciplined the pharmacist by issuing him a written warning and limiting his ability to work extra shifts for a three-month period. The pharmacist sued the Trustees of the University of Pennsylvania claiming Pharmacy leadership imposed discipline because he is Black. The pharmacist points to five comparators he believes establish an inference of discrimination because Penn treated them more favorably in imposing discipline. But the five are not valid comparators because they are not similarly situated in all material respects: two are not pharmacists and the three others are pharmacists who were not reported to be sleeping on the job. The pharmacist cannot meet his burden of establishing a prima facie case of race discrimination. But even if he did, he cannot show Penn's legitimate, non-discriminatory reason for imposing discipline is a pretext for race-based discrimination.

## I.  Undisputed Facts[1]

Dr. Maurice Nelson Clark, a Black man, is a licensed pharmacist currently employed by The University of Pennsylvania Health System.[2] Dr. Clark began working for Penn in 2013 as a Pharmacy Intern while in pharmacy school and, upon his graduation and later licensing, received promotions to the positions of Pharmacy Technician I and II, Graduate Pharmacist, Clinical Pharmacist, Senior Pharmacist, and Lead Pharmacist.[3]

Dr. Clark began working the nightshift as a "Clinical Pharmacist Night" in Penn's Department of Pharmacy Inpatient in January 2022.[4] Dr. Clark reported to Dr. Cassandra Bellamy who, in turn, reported to Dr. Sarah Erush, Associate Director of Pharmacy.[5] Dr. Clark also pursued his Master of Business Administration degree at Temple University in 2022 and cared for his two young children during the day while working at night.[6]

### The University of Pennsylvania Health System's discipline policies.

The University of Pennsylvania Health System maintains a Performance Improvement and Progressive Steps Policy.[7] There is no dispute Dr. Clark is subject to the Policy. The Policy provides for a five-step progressive disciplinary process: (1) coaching; (2) first written warning; (3) second written warning; (4) final warning; and (5) termination.[8] If an employee is subject to a progressive discipline step but remains infraction-free for one year, the discipline step is "deactivated."[9] Certain violations of the Policy may result in immediate termination, including sleeping on the job.[10]

The Health System also maintains a Managerial Decision Review Processes Policy.[11] The Review Policy enables an employee to challenge the imposition of a progressive disciplinary step. If an employee does not agree with a progressive step, he may schedule a meeting with his next

level manager for further consultation and review by completing a form and submitting it to Human Resources. The Review Process provides for next level "administrative review" by hearing and a finding and recommendation to the Executive Director or Senior Vice President of the Health System for final decision.

### A Manager reports Dr. Clark falling asleep on his May 5, 2022 overnight shift and given a First Written Warning on May 25, 2022.

Angalene Henry, Assistant Nurse Manager of the Emergency Department at the Hospital of the University of Pennsylvania, notified Dr. Erush a night shift nurse found Dr. Clark falling asleep "multiple times" at the nurses' station and in the pharmacy workroom during his shift on the night of May 5, 2022.[12] Nurse Manager Henry does not have supervisory authority over Dr. Clark.[13] Nurse Manager  Henry swore she did not know Dr. Clark's race at the time she notified Dr. Erush of the incident.[14]

Dr. Erush conferred with Dr. Clark's direct supervisor Dr. Bellamy, Chief Pharmacy Officer Alison Appel, and Senior Human Resources Business Partner Andrea Jenkins to review Nurse Manager Henry's report and determine appropriate discipline for Dr. Clark.[15] Dr. Bellamy reported she saw Dr. Clark asleep at work sometime earlier in the year and woke him up, but did not discipline him because she knew of his school and childcare obligations.[16] Dr. Clark swears Dr. Bellamy never woke him because he never fell asleep at work.[17]

Dr. Bellamy swore Pharmacy leadership, with Senior Human Resources Business Partner Jenkins, decided to issue Dr. Clark a First Written Warning under the Policy rather than terminate him.[18] Dr. Clark does not dispute this, but argues it is not the "real reason" for discipline and Penn did not proffer "admissible" evidence of him sleeping.

Dr. Erush and Dr. Bellamy met with Dr. Clark on May 25, 2022 to discuss the reported May 5, 2022 sleeping incident.[19] Dr. Erush swore Dr. Clark told her "everyone sleeps on night shift[,]" which Dr. Erush took as an admission he slept on the job.[20] Dr. Clark swears he denied being asleep.[21]

Dr. Erush and Dr. Bellamy issued Dr. Clark a First Written Warning for sleeping on the job on May 25, 2022.[22] The First Written Warning identified the "performance expectation that employees do not sleep while working" and limited Dr. Clark's total working hours to ninety hours per two-week pay period for three months, to be re-evaluated at the end of three months.[23]

### Dr. Clark reported a Pharmacy Intern sleeping on the job two days after receiving his discipline.

Dr. Clark swore he saw Charlotte Ye, a Pharmacy Intern in pharmacy school, sleeping on the job during her May 21 and 22, 2022 shifts.[24] Dr. Clark did not immediately report Intern Ye, and instead waited until May 27, 2022, after receiving his First Written Warning, to report her.[25] Dr. Clark conceded, in his sworn testimony, he reported Intern Ye in response to his First Written Warning.[26]

Pharmacist Lauren McCarthy supervised Intern Ye and conducted an investigation after Dr. Clark reported Intern Ye sleeping.[27] Dr. McCarthy could not corroborate Dr. Clark's report of Intern Ye's sleeping on the job because another Pharmacy Intern working with Intern Ye denied seeing her sleeping.[28] Dr. Clark concedes Dr. McCarthy spoke to Pharmacy Intern Antionette Robustelli about the report of Intern Ye sleeping on the job but disagrees with the way Dr. McCarthy conducted the investigation.[29]

4

***Dr. Clark's work history during the three-month period.***

The three-month period limiting Dr. Clark to ninety hours per pay period covered seven pay periods: June 17, July 1, July 15, July 29, August 12, August 26, and September 9, 2022.[30] Dr. Clark disputes this, arguing his discipline ended August 23 and not September 9.[31] Dr. Clark began working extra shifts in August 2022.[32] Dr. Clark's First Written Warning deactivated, consistent with the discipline Policy, on May 25, 2023.[33] Dr. Clark remains employed by Penn.

***Dr. Clark sued Penn.***

Dr. Clark pro se sued The Hospital of the University of Pennsylvania Inpatient Pharmacy Department on December 5, 2023 alleging Penn discriminated against him on the basis of his race in violation of Title VII.[34] Dr. Clark alleges Dr. Erush and Dr. Bellamy disciplined him by issuing him a First Written Warning and limiting his ability to work extra shifts during the three-month period because he is Black. He alleges no one investigated or disciplined Intern Ye for sleeping on the job after he reported it.[35]

***Dr. Clark's identified comparators.***

Dr. Clark identified five employees he claims violated Hospital policy and did not receive discipline: Intern Charlotte Ye (Asian); Pharmacist Emily Inverso (white); Pharmacy Technician Laurel Rogers (white); Pharmacist Kenneth O'Donnell (white); and Pharmacist Alexander Szymanik (white).[36]

- Intern Charlotte Ye: Charlotte Ye in May 2022 worked as an intern at Penn while in pharmacy school and supervised by Dr. McCarthy. Although Dr. Clark's Complaint swore Penn did not investigate his report of Intern Ye sleeping on the job, he conceded at his deposition Dr. McCarthy conducted an investigation of Intern Ye, which he learned after receiving documents

5

during litigation.[37] Dr. Clark testified he now believes the investigation into his report of Intern Ye sleeping "wasn't in good faith."[38] In opposition to summary judgment, Dr. Clark asserts Dr. McCarthy did not conduct a proper investigation because she asked another Pharmacy Intern Antoinette Rubustelli— who is a "medication runner" and not someone who worked with Intern Ye—about a report of sleeping. He also adds Penn treated Intern Ye more favorably because Dr. McCarthy did not properly investigate a complaint he made about Intern Ye filling a medication cart.[39]

- Pharmacist Emily Inverso: Dr. Inverso is a white Pharmacist supervised by Abraham Gibbs, Lead Pharmacist, Central Pharmacy.[40] Dr. Clark swore Dr. Gibbs, a Black man, asked him in April 2024, two years after Dr. Clark's First Written Warning, to work an overnight shift in the operating room for the purpose of observing Dr. Inverso because unidentified Pharmacy Technicians reported Dr. Inverso sleeping.[41] There is nothing in the record showing Dr. Clark observed Dr. Inverso sleeping. Dr. Gibbs swore he never witnessed Dr. Inverso sleeping, and no one ever reported to him Dr. Inverso sleeping on the job.[42] In response to summary judgment, Dr. Clark did not address his sworn deposition testimony regarding the Dr. Gibbs/Dr. Inverso sleeping incident. Instead, Dr. Clark now instead abandons the Dr. Gibbs/Dr. Inverso sleeping incident and argues Dr. Inverso created a hostile work environment for which she did not receive discipline.[43]

- Pharmacy Technician Laurel Rogers: Dr. Clark supervised Pharmacy Technician Rogers, who is white, while Dr. Clark held a Lead Pharmacist position from 2018 until January 2021.[44] Dr. Clark swore at his deposition he is not aware of a report of Technician Rogers sleeping on the job.[45] Dr. Clark instead testified Technician Rogers violated Hospital policy in several ways: she created a hostile work environment by "retaliating against people"; "sign posting"; and "time-

stealing."[46] Dr. Clark swore Technician Rogers did not sleep on the job but believes "sleeping is a form of time-stealing."[47] In response to summary judgment, Dr. Clark swears to a litany of disruptive conduct and other violative conduct by Pharmacy Technician Rogers in 2020 and 2021 without investigation or discipline.[48]

- Pharmacist Kenneth O'Donnell: Dr. O'Donnell is a white Pharmacist supervised by Dr. Scholz. Dr. Clark asserts Dr. O'Donnell has a history of workplace hostility and delaying medication deliveries to Hospital units from 2020 through 2022 without receiving discipline.[49] Dr. Clark reported Dr. O'Donnell sent Dr. Clark an "extremely unprofessional email … hostile email."[50] Dr. O'Donnell received discipline from his supervisor Dr. Scholz **and Dr. Clark** in response to the unprofessional email.[51] There is no evidence Dr. O'Donnell slept on the job.

- Pharmacist Alexander Szymanik: Pharmacist Szymanik, a white man, received a written warning for his "aggressive" and "extremely condescending" tone with co-workers creating a "hostile work environment" and "medication delivery delay."[52] Dr. Clark asserts Pharmacist Szymanik repeatedly violated Penn policy in 2020 and 2021 for gross misconduct, offensive language, intimidation, offensive behavior, and delaying medications.[53] Dr. Clark swore knowing Pharmacist Szymanik received discipline for his conduct.[54] There is no evidence Pharmacist Szymanik slept on the job.

### *Pharmacist Marie-Josephine Kissou reported sleeping on the job.*

Dr. Bellamy swore the only Pharmacist other than Dr. Clark reported sleeping at work is Dr. Marie-Josephine Kissou, a Black woman.[55] Dr. Bellamy swore Dr. Kissou worked an overnight shift at the time of her reported sleeping but did not receive discipline because of her pregnancy.[56] Dr. Kissou then moved to day shift. Dr. Clark's attorney deposed Dr. Bellamy but

did not ask her about the circumstances of Dr. Kissou's reported sleeping on the job. Dr. Clark did not identify Dr. Kissou as a comparator.

In response to summary judgment, Dr. Clark argues Dr. Kissou's "situation" is not similar to his "situation" because he received "severe discipline" for unfounded allegations as compared to white Pharmacists who did not receive discipline for "serious, repeated violations" of Penn policy.[57]

## II. Analysis

Penn moves for summary judgment on Dr. Clark's Title VII race-based discrimination claim.[58] It makes two arguments: (1) Dr. Clark failed to establish the fourth element of the prima facie case of race discrimination by showing his discipline occurred under circumstances giving rise to an inference of intentional discrimination; and (2) even if Dr. Clark met his burden of establishing a prima facie case of race-based discrimination, he cannot show Penn's legitimate, non-discriminatory reason for the imposed discipline is pretextual.

Dr. Clark opposes summary judgment, arguing he established a prima facie case of race-based discrimination through comparator evidence and Penn does not have a legitimate, non-discriminatory reason for disciplining him because there is no evidence he actually slept or fell asleep during his May 5, 2022 shift.[59] He also argues Penn cannot "corroborate" or "support" the discipline without relying on the hearsay statement of Nurse Manager Henry's email reporting him sleeping.

We conclude Dr. Clark fails to establish a prime facie case of race-based discrimination and, even if he did, did not meet his burden to show Penn's legitimate, non-discriminatory reason for disciplining him is a pretext for discrimination.

### A.  Title VII prohibits race-based discrimination in employment.

It is unlawful under Title VII for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, ***because of*** such individual's race …"[60] To prevail on a race discrimination claim, Dr. Clark must first establish a prima facie of discrimination under the *McDonnell Douglas* burden shifting analysis.[61] Dr. Clark must show (1) he is a member of a protected class; (2) he is qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances which could give rise to an inference of intentional discrimination.[62]

If Dr. Clark meets his burden of establishing a prima facie case of discrimination, the burden shifts to Penn to articulate a legitimate, non-discriminatory reason for its adverse employment action.[63] If Penn meets its burden, the burden shifts back to Dr. Clark to show Penn's "proffered reason is merely pretext for intentional discrimination."[64] To show pretext, Dr. Clark "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [Penn's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Penn's] action."[65] Under the *McDonnell Douglas* burden-shifting framework, "the ultimate burden of proving intentional discrimination always rests with the plaintiff."[66]

### B.  There are no comparator employees to support Dr. Clark's prima facie case of race-based discrimination.

Penn does not dispute the first three elements of a prima facie case of race-based discrimination. Penn only argues Dr. Clark cannot demonstrate the fourth element of the prima

facie case: the May 25, 2022 first written warning occurred under circumstances which could give rise to an inference of intentional discrimination.

Dr. Clark may establish an inference of discrimination by demonstrating Penn treated similarly situated employees outside his protected class more favorably. "The central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin."[67]

Dr. Clark relies entirely on five comparators who he believes Penn treated more favorably. Our Court of Appeals recently instructed comparator employees "need not be identical but must be similarly situated in '***all material respects***.'"[68] In "all material respects" is determined by factors including whether the comparator employees "dealt with the same supervisor, were subject to the same standards, and shared similar job responsibilities" and "engaged in the same conduct."[69] A comparator employee "who holds a different job title or works in a different department is not similarly situated."[70]

Comparators' conduct must also be the same. In *Gazarov v. Diocese of Erie*, our Court of Appeals rejected Plaintiff's argument his conduct is less serious than a comparator who received no discipline or less discipline.[71] Plaintiff argued he and another student are similarly situated because both were accused of "serious infractions" but only he received a suspension from school. Our Court of Appeals rejected this argument, finding the other student is not a proper comparator because a "plaintiff may assert a subjective belief that another's behavior is more serious, but unless it is the ***same*** conduct as the plaintiff's, the supposedly more serious act by the comparator is irrelevant."[72]

Two of Dr. Clark's identified comparators are Pharmacy Intern Ye and Pharmacy Technician Rogers. They are not Pharmacists. They do not have the same job title as Dr. Clark and are not similarly situated in "all material respects." Our Court of Appeals in *Quin* plainly instructed comparator employees who hold different job titles are not similarly situated.[73]

The other three identified comparators—Dr. Inverso, Dr. O'Donnell, and Dr. Szymanik—are all Pharmacists. But the similarity stops there. None of the three Pharmacists were reported sleeping on the job. Dr. Clark abandoned his argument Dr. Gibbs asked him to observe Dr. Inverso on a report of her sleeping on the job in response to summary judgment. Penn provided Dr. Gibbs's sworn statement he never saw Dr. Inverso sleeping, and no one ever reported to him Dr. Inverso sleeping on the job. Dr. Clark did not address this issue and now argues Dr. Inverso created a hostile work environment, a serious violation of Penn policy, and did not receive discipline. But Dr. Inverso is not a proper comparator. Her supervisor is Dr. Gibbs. Dr. Clark's supervisors are Dr. Bellamy and Dr. Erush. And there is no evidence of her sleeping on the job.

Dr. O'Donnell and Dr. Szymanik are Pharmacists. Neither were reported sleeping on the job. Both were reported having conduct issues and both received discipline for their conduct. In fact, Dr. Clark initiated the discipline imposed on Dr. O'Donnell.

The only other Pharmacist found to be sleeping on the job is Pharmacist Kissou, who is Black. She did not receive discipline from Dr. Bellamy for sleeping on the job. Dr. Clark ignores this undisputed fact.

There is no evidence Penn treated similarly situated employees outside Dr. Clark's protected class more favorably. He cites no other evidence. While comparator evidence is not the only way to support in inference of discrimination at the prime facie stage, Dr. Clark does not cite

record evidence of similar racial discrimination of other employees or conduct by his supervisors Dr. Bellamy and Dr. Erush suggesting racial animus. Dr. Clark's argument at the prima facie stage is all employees who violate Penn's policies are comparators regardless of the job held or policy infraction committed. This is not the law. Comparators must be similarly situated in "all material respects," including job title, supervisor, and nature of the conduct.

We conclude Dr. Clark fails to meet his burden on the fourth prong of the prima facie case of race-based discrimination.

### C. Even if Dr. Clark met his burden of establishing a prima facie case, he does not show Penn's legitimate non-discriminatory reason for discipline is pretextual.

Even if Dr. Clark met his burden at the prima facie step, he cannot show pretext. Penn's legitimate non-discriminatory reason for imposing discipline is sleeping on the job. It is Dr. Clark's burden to show the reason is pretextual. Dr. Clark must point to some evidence, direct or circumstantial, from which the jury could reasonably disbelieve Penn's articulated legitimate reason or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Penn's discipline.

Dr. Clark argues Penn does not have a legitimate, non-discriminatory reason for disciplining him because: (1) Penn never had a legitimate, non-discriminatory reason for its discipline, as it has no competent and admissible evidence he ever slept on the job; (2) Dr. Bellamy and Dr. Erush relied solely on rumor and hearsay in Nurse Manager Henry's email without corroboration; and (3) Dr. Bellamy and Dr. Erush disciplined him without a fact-finding process required by Penn's policies, and the Human Resources Department denied him appeal rights under the Managerial Review Process.

The first two arguments overlap. Dr. Clark argues Nurse Manager Henry did not witness him reportedly falling asleep or asleep; cannot identify the nightshift nurse who reported the sleeping allegation or the "reporting nurse" who found him falling asleep; did not "look at any data," notes, or "statements or summaries" from anyone before she wrote her email to Dr. Bellamy and Dr. Erush; did not ask for a statement from the nurse making the report; and otherwise failed to take any other steps to verify the information reported to her by a night shift nurse. Dr. Clark then argues Dr. Bellamy and Dr. Erush relied on the hearsay-filled email from Nurse Manager Henry to discipline him.

Penn replies Nurse Manager Henry's email is not hearsay because it is not offered for the truth, but on the effect of the email on Dr. Bellamy and Dr. Erush as the decisionmakers.[74] Nurse Manager Henry's email is not hearsay; it is not being offered for its truth but rather, explains why Dr. Bellamy and Dr. Erush imposed discipline on Dr. Clark.[75] Our Court of Appeals in *Larochelle v. Wilmac Corporation* rejected a similar hearsay argument. Plaintiff argued her employer terminated her employment by relying on unverified handwritten statements to the supervisor constituting hearsay. Our Court of Appeals rejected the argument, concluding the employer offered the statements "to explain why" it terminated plaintiff and not for their truth.[76]

Our Court of Appeals in *Fahnestock v. Carlisle Regional Medical Center* affirmed the entry of summary judgment in favor of the employer hospital.[77] The plaintiff employee argued disciplinary citations forming the basis of her termination, including complaints by unidentified physicians and undisclosed information on when or how the unidentified physicians made the complaints, are hearsay. Our Court of Appeals rejected the hearsay argument, explaining the

disciplinary citations were not offered as evidence to prove the truth but to explain the hospital's motivation in terminating employment.[78]

Penn's explanation for the discipline is the report of Dr. Clark falling asleep or asleep on the job. Dr. Clark disagrees with Penn's investigation and decision, but he must do something more than show Penn's decision is "wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motived [Penn], not whether [it] is wise, shrewd, prudent, or competent."[79] Even if Nurse Manager Henry's email is wrong or mistaken and Dr. Clark did not sleep on the job, he must still offer evidence showing how a factfinder could reasonably either disbelieve Penn's legitimate, non-discriminatory reasons for his discipline or believe an invidious race-based discriminatory reason is more likely than not a motivating or determinative cause of his discipline.

There is no dispute Nurse Manager Henry did not supervise Dr. Clark, is not the decisionmaker in his discipline, and did not know Dr. Clark's race. There is no dispute sleeping on the job is an immediate terminable offense, but Dr. Bellamy and Dr. Erush decided to issue a First Written Warning and limit Dr. Clark's ability to work extra shifts for a three-month period instead of terminating him. There is nothing in the record to show Dr. Bellamy and Dr. Erush imposed discipline because of a discriminatory animus.

Dr. Clark next argues he received discipline in violation of the Hospital's Policy and Managerial Decision Review Process. Dr. Clark argues the Policy requires leadership to "engage in a fair, equitable and reasonable process" and Dr. Bellamy and Dr. Erush did not do so and waited too long to interview him. There is no dispute Dr. Bellamy and Dr. Erush met with Dr. Clark to discuss the allegation of sleeping, which Dr. Clark denied. Dr. Clark again merely disputes the

way Dr. Bellamy and Dr. Erush conducted the investigation without any record evidence of a discriminatory animus.

Dr. Clark also argues Human Resources Business Partner Jenkins, who is Black, did not respond to his email seeking to appeal the imposed discipline. He argues it is the responsibility of Human Resources to explain the appeal process to him and direct him to the appropriate resources. Dr. Clark argues Human Resources Business Partner Jenkins's failure to respond to his emails is evidence of race-based discrimination. He argues Human Resources Business Partner Jenkins denied him an appeal of his May 25, 2022 discipline but Penn gave white Pharmacist O'Donnell an appeal of discipline received in January 2023. Dr. Clark argues this demonstrates Penn's reason for discipline is pretextual. We see no nexus between the discipline imposed on Dr. Clark and Human Resource Business Partner Jenkins not responding to his emails regarding an appeal. Dr. Clark does not explain how the discipline imposed on him *before* Human Resource Business Partner Jenkins's lack of response is a pretext for race-based discrimination.

## III.  Conclusion

Dr. Clark bears the ultimate burden of proving intentional discrimination. Dr. Clark did not meet his burden to establish a prima facie case of discrimination. Even if he did, he does not cite evidence from which a factfinder could reasonably either disbelief Penn's legitimate, non-discriminatory reason for his discipline or believe an invidious discriminatory reason is more likely than not a motivating cause of Penn's imposition of discipline. He has no valid comparators and no evidence of pretext.

---

[1] Our Policies require parties moving for relief under Fed. R. Civ. P. 56 include a Statement of Undisputed Material Facts ("Penn SUMF") and an appendix to support summary judgment. Defendant The Trustees of the University of Pennsylvania ("Penn") filed its Motion, SUMF, Memorandum in support of summary judgment, and Appendix at ECF 33. Dr. Clark opposed the motion, included an Additional Statement of Undisputed Material Facts ("Clark SUMF"), responded to Penn's SUMF, and an untimely supplemental Appendix at ECF 41, 41-2, and 41-3 through 41-4. Penn filed a reply brief at ECF 42.

[2] ECF 33-1, Penn SUMF ¶¶ 6-10.

[3] ECF 33-4, Appendix 66-67, Stipulated Facts ¶¶ 2-10.

[4] ECF 33-1, Penn SUMF ¶ 10.

[5] *Id.* ¶¶ 11-12.

[6] *Id.* ¶¶ 13-14.

[7] *Id.* ¶ 15; ECF 33-4, Appendix 119-128.

[8] ECF 33-1, Penn SUMF ¶ 16.

[9] *Id.* ¶ 19.

[10] *Id.* ¶¶ 17-18; ECF 33-4, Appendix 126.

[11] ECF 33-4, Appendix 129-135.

[12] ECF 33-1, Penn SUMF ¶ 23; ECF 33-4, Appendix 142.

[13] ECF 33-1, Penn SUMF ¶ 27. This is an example of one of the many facts Dr. Clark does not directly address as required by Rule 56(c). Penn asserts Nurse Manager Henry does not have supervisory authority over Dr. Clark, citing her sworn statement. *Id.* Dr. Clark disputes Penn's SUMF ¶ 27, referring us to his Statement of Additional Undisputed Material Facts. *See* ECF 41-2 ¶¶ 23-29. Dr. Clark's Statement of Additional Undisputed Material Facts does not admit or deny the specific assertion Nurse Manager Henry does not have supervisory authority over him, instead asserting facts he believes makes Nurse Manager Henry's email unworthy of credence and hearsay. *See* ECF 41-1 ¶¶ 1-15. Having failed to do so, we consider the assertion Nurse Manager Henry does not have supervisory authority over Dr. Clark as undisputed for purposes of the motion. Under Rule 56, Dr. Clark must address each of Penn's assertion of facts.

[14] ECF 33-1, Penn SUMF ¶ 26. Here again, Dr. Clark does not directly address Penn's asserted fact Nurse Manager Henry did not know his race at the time she reported him sleeping.

[15] *Id.* ¶ 29.

[16] *Id.* ¶ 31-32.

[17] ECF 41-3, Appendix 221, Clark Declaration ¶ 81.

[18] ECF 33-1, Penn SUMF ¶ 36. Dr. Clark does not deny Dr. Bellamy's sworn deposition testimony. He instead denied Penn's SUMF ¶ 36 because "[t]here statements of fact are not the real reasons Dr. Clark received discipline on May 25, 2022 …" *See* ECF 41-2 ¶ 36. This is legal argument. Dr. Clark argues Nurse Manager Henry's email to Dr. Erush is hearsay and is inadmissible. But the assertion here is Dr. Bellamy's sworn testimony she and the decisionmakers decided to issue a lesser form of discipline—a First Written Warning—rather than termination. Dr. Clark did not address this asserted fact. If Dr. Clark's disputes an asserted fact, Rule 56(c) requires him to cite to the record or show the materials cited do not support the asserted fact.

[19] ECF 33-1, Penn SUMF ¶ 37. The fact asserted here is Dr. Erush and Dr. Bellamy met with Dr. Clark on May 25, 2022 regarding the report of sleeping. Again, Dr. Clark denied this basic fact based on his assertion he never fell asleep at work. ECF 41-2 ¶¶ 37-40. But at the same time, he submitted a Declaration in opposition to summary judgment swearing he met with Dr. Bellamy and Dr. Erush on May 25, 2022. *See* 41-3 ¶ 1.

[20] ECF 33-4, Appendix 172, Verified Statement of Dr. Erush ¶¶ 4-5.

[21] ECF 41-2, Clark Response to Penn SUMF ¶ 38.

[22] ECF 33-1, Penn SUMF ¶ 39, ECF 33-4, Appendix 174.

[23] ECF 33-1, Penn SUMF ¶ 42. A pay period is every two weeks. Penn clarifies Dr. Clark is an exempt employee (presumably under the Fair Labor Standards Act) so the dispute is more properly over "extra shifts" and not "overtime." ECF 33-1, Penn SUMF ¶ 45, n. 1. Dr. Clark disputes the amount of time night pharmacists work per pay period. *See* Clark Response to Penn SUMF ¶ 42. Dr. Clark asserts night pharmacists worked only seventy hours per pay period, not eighty hours, making the total number of allowable hours worked during his three-month disciplinary period eighty hours, not ninety hours. *Id.*; ECF 41-3, Appendix 222, Clark Declaration ¶ 94. Dr. Clark's Declaration is belied by the record. First, Dr. Clark stipulated to the fact the First Written Warning limited him to working **ninety** hours per pay period during the three-month disciplinary period. ECF 33-4, Appendix 67, ¶ 16. Second, Dr. Clark swore at his deposition the discipline limited him to **ninety** hours for three months. ECF 33-4, Appendix 43, Clark N.T. 116:14-24.

[24] ECF 33-1, Penn SUMF ¶ 62; ECF 41-1, Clark SUMF ¶ 49. There is no dispute Intern Ye is Asian.

[25] ECF 33-1, Penn SUMF ¶ 64. Dr. Clark asserts he reported Intern Ye sleeping at his May 25, 2022 meeting with Dr. Bellamy and Dr. Erush. ECF 44-1, Clark SUMF ¶ 49. The date is not

material, but we note Dr. Clark earlier stipulated he reported Intern Ye on May 27, 2022. ECF 33-4, Appendix 67 ¶ 14.

[26] ECF 33-1, Penn SUMF ¶¶ 62-65.

[27] *Id.* ¶ 68.

[28] *Id.*

[29] ECF 41-1, Clark SUMF ¶¶ 50-51.

[30] ECF 33-1, Penn SUMF ¶¶ 42, 50.

[31] ECF 41-2, Clark SUMF ¶ 50; ECF 41-3, Appendix, Clark Declaration ¶ 95. But Dr. Clark does not dispute the three-month disciplinary period covered the pay periods reflected in the payroll records. ECF 33-4, Appendix 176-184. Dr. Clark disputes his damages, relying on an Excel spreadsheet he provided in discovery but which he does not include in the record for our review. ECF 41-3, Appendix 223 ¶ 95.

[32] ECF 33-1, Penn SUMF ¶ 45.

[33] *Id.* ¶ 48.

[34] ECF 1. After our May 13, 2024 initial pretrial conference, we amended the caption on the parties' consent to dismiss the improperly named "The Hospital of the University of Pennsylvania Inpatient Pharmacy Department" to accurately reflect the proper employer Defendant "The Trustees of the University of Pennsylvania. ECF 15 ¶ 2.

[35] ECF 1 at 3, § E; ECF 33-1, Penn SUMF ¶ 56.

[36] ECF 33-1, Penn SUMF ¶ 57; ECF 33-4, Appendix 45, Clark N.T. 122:22-25, 123:1-12. Dr. Clark's response to summary judgment clarified he did not identify Andreas (Mathis) Jenkins as a comparator. ECF 41-2, Clark Response to Penn SUMF ¶¶ 96-98.

[37] ECF 33-1, Penn SUMF ¶ 69; ECF 33-5, Appendix 27, Clark N.T. 53:9-25, 54:1-18.

[38] ECF 33-4, Appendix 28, Clark N.T. 54:13-18.

[39] ECF 41-3, Appendix 215, Clark Declaration ¶¶ 33-34.

[40] ECF 33-1, Penn SUMF ¶ 75.

[41] *Id.* ¶¶ 73-74.

---

[42] *Id.* ¶ 78; ECF 33-4, Appendix 207, Verified Statement of Dr. Gibbs.

[43] ECF 41-1, Clark SUMF ¶¶ 53-56.

[44] ECF 33-1, Penn SUMF ¶ 84; ECF 33-4, Appendix 30, Clark N.T. 63:16-18.

[45] ECF 33-1, Penn SUMF ¶ 85; ECF 33-4, Appendix 31, Clark N.T. 67:6-14.

[46] ECF 33-4, Appendix 31, Clark N.T. 66:21-25, 67:1-14.

[47] *Id.* 67:6-14.

[48] ECF 41-1, Clark SUMF ¶¶ 57-69.

[49] *Id.* ¶¶ 70-86.

[50] ECF 33-1, Penn SUMF ¶¶ 87-89.

[51] ECF 41-1, Clark SUMF ¶ 79.

[52] ECF 33-4, Appendix 39, Clark N.T. 101:3-25, 102:1-20.

[53] ECF 41-1, Clark SUMF ¶¶ 87-95.

[54] ECF 33-4, Appendix 39, Clark N.T. 100:23-25, 101:1-16.

[55] ECF 33-4, Appendix 202-03.

[56] *Id.*

[57] ECF 41-3, Clark SUMF ¶¶ 26-27.

[58] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). "Summary judgment is appropriate only if, after drawing all reasonable inferences in favor of the non-moving party, there exists 'no genuine dispute as to any material fact' and the movant 'is entitled to judgment as a matter of law.'" *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 469 (3d Cir. 2021) (quoting *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 770 (3d Cir. 2018)). We do not weigh evidence or make credibility determinations. *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019)).

"The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Id.* (citing *Celotex*, 477 U.S. at 322–23).

[59] ECF 41.

[60] 42 U.S.C. § 2000e-2(a)(1) (emphasis added).

[61] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[62] *Qin v. Vertex, Inc.*, 100 F. 4th 458, 473 (3d Cir. 2024) (citing *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)).

[63] *Id.* at 474 (citing *Makky*, 541 F.3d at 214).

[64] *Id.*

[65] *Id.* at 474–75 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

[66] *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

[67] *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) (per curiam) (internal quotation marks removed).

[68] *Qin*, 100 F.4th at 474 (emphasis added) (quoting *In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018)).

[69] *Id.*; *In re Tribune Media Co.*, 902 F.3d at 403 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

[70] *Qin*, 100 F.4th at 474 (citing *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013)).

[71] 80 F. App'x 202 (3d Cir. 2003).

[72] *Id.* at 206 (citing *Mitchell*, 964 F.2d at 583).

[73] *Qin*, 100 F.4th at 474.

[74] ECF 42 at 7.

[75] *Larochelle v. Wilmac Corp.*, 769 F. App'x 57, 65 (3d Cir. 2019).

[76] *Id.* at 64–65.

[77] 659 F. App'x 75 (3d Cir. 2016).

[78] *Id.* at 79.

[79] *Fuentes*, 32 F.3d at 765.